**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. BRETT DAVID ROSEN (1); DEBORAH RACHEL ROSEN (2); RB CAPITAL PARTNERS, INC. (3), Defendants. | Case No.: 26-cr-00192-DMS **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR RETURN OF SEIZED PROPERTY** |

Defendants Brett and Deborah Rosen and their company, Defendant RB Capital Partners, Inc. ("RB Capital"), contest the Government's pretrial seizures of numerous assets following their indictment on January 16, 2026, for securities fraud and money laundering. The Government contends the seizures are proper as Defendants orchestrated a "pump and dump" securities fraud scheme involving more than $100 million in stock sales and laundered proceeds from the scheme through sixteen financial accounts and acquisition of real and personal property. Defendants allegedly carried out the securities fraud scheme by identifying growing companies with existing aged debt, arranging to

purchase that debt and loan the companies additional capital at well-above-market fixed stock conversion rates, and then amending the notes they had purchased and converting them to stock at deep discounts. Defendants then would post to their large social media following and tout the stock, positioning themselves as long-term investors, providing false information about the price at which they were obtaining stock, and falsely claiming that they had not and were not selling stock when, in reality, they were selling large amounts of their deeply discounted stock unbeknownst to the investing public. As a result, the Government sought and obtained numerous pretrial seizure warrants and seized all funds in accounts involved in, and all real and personal property traceable to, the alleged money laundering scheme. Defendants now seek return of the seized property, contending the Government has not established the property is connected to the alleged securities fraud. For the reasons set forth below, the Court denies Defendants' motion with respect to most of the seized assets.

## I. PROCEDURAL BACKGROUND

On January 16, 2026, the grand jury returned a twenty-four-count Indictment against (1) Defendants Brett and Deborah Rosen for conspiracy to commit securities fraud from August 10, 2020 to October 14, 2024, 18 U.S.C. § 371 (Count One) and securities fraud, 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff, 17 C.F.R. § 240.10b-5 (Count Two); (2) Defendants Brett and Deborah Rosen and RB Capital for conspiracy to money launder, 18 U.S.C. § 1956(h) (Count Three); and (3) Defendants Brett and Deborah Rosen for transactional money laundering, 18 U.S.C. § 1957 (Counts Four through Twenty-Four). The Indictment included forfeiture allegations pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1). Following return of the Indictment, Magistrate Judge Barbara Major authorized a residential search warrant and eight seizure warrants on January 20, 2026, which authorized the United States based on a probable cause showing to seize as fruit and evidence of the crimes Defendants' residence, two vehicles, jewelry and other personal items, electronic devices, and sixteen financial accounts containing approximately $6.439 million in cash and stocks.

Before the Court is Defendants' motion for return of the seized property pursuant to Federal Rule of Criminal Procedure 41(g), (Mot., ECF No. 75, at 4), and to set aside the lien on their residence, (*see* ECF No. 91, at 1–2). The matter is fully briefed, (*see* ECF Nos. 75, 82, 84, 87, 89–92), and was heard on June 25, 2026, (ECF No. 85), and July 10, 2026, (ECF No. 93). The Court has carefully considered the briefs, legal authority, submitted evidence, and oral argument.

## II. DISCUSSION

Defendants argue the Government has seized virtually all their assets, depriving them of their Sixth Amendment right to retain counsel of their choice and making it difficult to pay living expenses. Under these circumstances, Defendants contend the Government bears the burden to show its post-restraint, pretrial seizures are supported by probable cause to believe the restrained assets are traceable to the charged offenses. *See Kaley v. United States*, 571 U.S. 320, 323–24 (2014) (requiring the Government to demonstrate probable cause that the assets are forfeitable upon conviction, including "that the property at issue has the requisite connection to that crime"); *see also United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) (holding due process requires under such circumstances a "hearing at which the government must establish probable cause to believe that the restrained assets are traceable to the underlying offense").

The Court agrees and finds Defendants have made the necessary showing, thus requiring the Government to demonstrate probable cause that the restrained assets are connected to the charged offenses. To meet that burden the Government need only show a "fair probability" the assets are traceable to illegal activity. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Government argues it has met that burden based on the Indictment, the residential search warrant and eight seizure warrants signed by Judge Major, the affidavits of Federal Bureau of Investigation ("FBI") Special Agent Amanda M. Stewart in support of the applications for the warrants, and the Declaration, Supplemental Declaration, and Second Supplemental Declaration of FBI Forensic Accountant Benjamin M. McDonnell.

The Government contends Defendants' intricate web of financial transactions was designed to further the securities fraud scheme and conceal its proceeds in violation of money laundering statutes §§ 1956(h) and 1957, thus warranting forfeiture under §§ 981(a)(1)(C) and 982(a)(1).

**A. Money Laundering Under § 1956(h)**

The statutory authority relied upon by the Government is sweeping. Section 1956(h) proscribes "conspir[ing] to commit any offense defined in [section 1956] or section 1957." 18 U.S.C. § 1956(h). Conspiracy to commit money laundering in violation of § 1956 requires proof that there was an agreement to commit money laundering with the defendants knowing the objective of the agreement and joining the agreement with intent to further its unlawful purpose. *See* 9th Cir. Crim. Jury Instr. 18.7A (Section 1956 Money Laundering Conspiracy). Conspiracy to commit money laundering in violation of § 1957(a) "requires proof that [d]efendants agreed to engage in a monetary transaction over $10,000 derived from a criminal act." *United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013).

"Generally, a conviction under § 1957 requires that the government be able to trace the money transactions at issue to [unlawful activity]," *id.* (citing *United States v. Rutgard*, 116 F.3d 1270, 1291–92 (9th Cir. 1997) (requiring tracing each money transaction over $10,000 directly to unlawful activity)), while a conviction under § 1956 requires showing that the financial transaction constituting the money laundering offense involved property that represented the proceeds of prior separate criminal activity, *see* 9th Cir. Crim. Jury Instr. 18.3 (Financial Transaction or Attempted Transaction to Promote Unlawful Activity). However, tracing to prior separate criminal activity is not required where *conspiracy* to commit money laundering is charged. As the *Chao Fan Xu* court stated:

> The government concedes that they are unable to trace the proceeds of the Bank of China fraud directly to the money brought into the United States. . . . But Defendants were charged with conspiracy, a crime that does not require completion of the object offense. . . . *Contrary to the Defendants' contention, no tracing is necessary in this case. The agreement itself*

> *establishes that the funds to be transferred are a portion of the illegally derived proceeds.* All that is required here, where the crux of Defendants' … convictions [under § 1957] is that Defendants *agreed* to transfer to the United States more than $10,000 *in fraudulent proceeds,* is that: there was an agreement to transfer that amount of the "fraudulent proceeds[.]"

706 F.3d at 980 (first emphasis added) (citations omitted). Here, Defendants were indicted by the grand jury based on a probable cause standard for violating § 1956(h), that is, conspiring to commit money laundering in violation of §§ 1956(a)(1)(A) & (B) and 1957. (*See* Indictment, ECF No. 1, at 26–28.) The elements of §§ 1956(a)(1)(A) & (B) and 1957 are set out below.

1. Section 1956(a)(1)(A) & (a)(1)(B)

Section 1956 "criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds." *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (citation omitted) (discussing types of § 1956 money laundering). Under § 1956(a)(1)(A)(i), a transaction involving proceeds of unlawful activity is illegal if it is designed "to promote the carrying on of specified unlawful activity" ("promotional money laundering"), *id.* at 548, while under § 1956(a)(1)(B)(i), such a transaction is illegal if it is "designed in whole or in part … to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" ("concealment money laundering"), *id.* at 545.

Section 1956 money laundering requires proof that the defendant conducted a financial transaction with knowledge that the property represented proceeds from specified unlawful activity (here, securities fraud), with intent to promote that activity or to conceal the proceeds of such activity. *See* 9th Cir. Crim. Jury Instr. 18.4 (Laundering Monetary Instruments); *Wilkes*, 662 F.3d at 547 (finding evidence at trial sufficient to convict under § 1956(a)(1)(B)(i) [concealment money laundering] where the defendant "engaged in a number of financial transactions, including transferring the money to three different accounts within the course of a single week, in an attempt to conceal both the source and future ownership of the money").

2. Section 1957

Under § 1957(a), a transaction is illegal if it is "a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity" ("transactional money laundering"). 18 U.S.C. § 1957(a). Section 1957 money laundering requires proof that the defendant knowingly engaged in a monetary transaction (*e.g.*, depositing, withdrawing, or transferring funds through a financial institution) involving criminally derived property that had a value in excess of $10,000 and the property in fact was derived from specified unlawful activity (here, securities fraud). *See* 9th Cir. Crim. Jury Instr. 18.7 (Money Laundering).

On the present motion, Defendants do not contest that the Government has made a probable cause showing of conspiracy to money launder under §§ 1956 and 1957. Rather, Defendants contend the Government has not established that the seized assets are traceable to the alleged securities fraud. Defendants argue under 21 U.S.C. § 853(e) the Government may "obtain a pretrial restraining order over only those assets that are directly subject to forfeiture as property traceable to a charged offense." (Defs.' Suppl. Br., ECF No. 89, at 3 (citation omitted).) The Government argues its primary focus is on conspiracy to violate § 1956 as the charged offense (not securities fraud), and § 982(a)(1) forfeiture broadly reaches all property involved in the money laundering offense or any property traceable to the property used in the money laundering offense.

**B. Forfeiture Under § 982(a)(1)**

The Government obtained the seizure warrants under §§ 981(a)(1)(C) and 982(a)(1). The Court begins with § 982(a)(1) since that statute is specific to money laundering offenses and supports the Government's seizures here. It provides that "a person convicted of an offense in violation of section 1956, 1957, or 1960 of [Title 18], shall . . . forfeit . . . any property, real or personal, *involved in* such offense, or any property *traceable to* such property." 18 U.S.C. § 982(a)(1) (emphases added). Thus, the target of forfeiture under § 982(a)(1) is the laundering activity itself, not the prior separate unlawful activity (namely, securities fraud).

The key to whether property is forfeitable under § 982(a)(1) is whether it is "involved in" or "traceable to" the laundering offense. With § 1956 money laundering offenses, the term "'property involved' is intended to include the money or other property being laundered (the corpus), . . . and *any property used to facilitate the laundering offense*." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) (emphasis in original) (citation omitted). "Facilitation occurs when the property makes the prohibited conduct [*i.e.*, the laundering offense] 'less difficult or more or less free from obstruction or hindrance.'" *Id.* (citation omitted). "In contrast, property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (citations omitted). "In other words, proof that the proceeds of the money laundering transaction enabled the defendant to acquire the property is sufficient to warrant forfeiture as property 'traceable to' the offense." *Id.* *Bornfield* provides a useful analogy to explain the difference between "involved in" and "traceable to":

> For example, if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money as property 'involved in' the money laundering offense. If, on the other hand, the defendant purchases a $500,000 item with that money, the government may seek the item purchased as property 'traceable to' property involved in the money laundering offense. In both scenarios the property, the $500,000 cash or the item purchased with the cash, is forfeitable property pursuant to 18 U.S.C. § 982(a)(1).

*Id.* at 1135–36.

Here, as discussed, the Government has made a probable cause showing through its Indictment (and other evidence) that Defendants conspired to launder the proceeds of their fraud scheme in violation of § 1956. The question now is whether there is sufficient evidence establishing that funds in Defendants' accounts and property acquired with those funds are "involved in" or "traceable to" the § 1956 laundering offense. In other words, the focus is not on whether the property at issue is derived from separate unlawful activity, *i.e.*, securities fraud, but rather whether the property is involved in or traceable to the

financial transactions constituting the money laundering offense. Notably, this focus merges with § 1956(h) conspiracy since the Government need not trace to the separate unlawful activity, *i.e.*, securities fraud. *See Chao Fan Xu*, 706 F.3d at 980 (stating "no tracing is necessary" in such cases as "[t]he agreement itself establishes that the funds . . . are a portion of the illegally derived proceeds"). The Court finds the Government has met its burden to show that all seized assets—except for one financial account and several personal property items (jewelry)—are involved in or traceable to the money laundering offense.

1. <u>RB Capital Accounts</u>

The Government contends that all stock sales proceeds held in RB Capital accounts are forfeitable. The Court agrees and finds that the Government's evidence goes beyond what is required under § 982(a)(1) as it shows there is probable cause to believe that the Rosens engaged in prohibited stock sales, (*see* Stewart Second Aff., ECF No. 87-1, at 3–22), and used RB Capital's accounts to place those proceeds, funnel such proceeds to other individual accounts held by the Rosens, acquire property, and continue the securities fraud by concealing the proceeds and investing in other growing companies. (*Id.* at 22–54.) The Court credits the Government's proffer that it "knows of no legitimate business conducted through RB Capital." (*See* Gov't's Suppl. Br., ECF No. 90, at 20; McDonnell Suppl. Decl., ECF No. 90-1, ¶ 122 (stating based on review of Defendants' financial accounts, "the main revenue stream of the [Defendants] is the sale of stock through RB Capital. No other major source of income could be identified.").) The evidence shows that most of the funds contained in any RB Capital account at time of seizure came from the securities fraud scheme and were traceable to proceeds generated by that scheme. (*See* Stewart Second Aff. ¶ 41 ("In total, based on a review of trading and financial records obtained through this investigation for at least six different companies [referenced in the Indictment] the ROSENS have invested in . . . during the conspiracy period . . .[,] the ROSENS sold over $100 million worth of stock as part of their market manipulation scheme."); McDonnell Decl., ECF No. 82-1, ¶ 37 (stating from September 11, 2020 through September 21, 2022,

RB Capital had gross sales of $94 million from the six companies listed in the Indictment, which comprised 90% of the approximately $103 million in RB Capital's WF 4171 account).)

RB Capital's main account was WF 4176. Just as "all roads lead to Rome,"[1] all accounts at issue—RB Capital accounts and the individual accounts—lead to WF 4176. (*See* McDonnell Suppl. Decl., Ex. E.7, at 51, 133 (chart of accounts).) WF 4176 directly or indirectly funded every account.[2] (*See generally id.* at 2–30; *id.* at 37–54.)

WF 4176 opened on April 25, 2017, in the name of RB Capital with Defendants Brett and Deborah Rosen as sole signatories. (*See* Stewart Second Aff. ¶ 133.) From September 18, 2020 through August 24, 2023, WF 4176 had total inflows of $119,781,442 and total outflows of $120,123,150. (*Id.* ¶ 134.) The account was closed on August 24, 2023, (*id.*), and for approximately three weeks prior to closing that account Defendants transferred $2,068,114 to BofA 3757 in the name of RB Capital, which Defendants opened as sole signatories on July 26, 2023. (*Id.* ¶¶ 141, 145.) From July 26, 2023 through August 29, 2025, BofA 3757 had total inflows of $16,702,693. (*Id.* ¶ 145.) BofA 3757 remained RB Capital's largest account until the seizures at issue and "was primarily funded by RB Capital Partners Inc.'s sales of stocks, including the 6 tickers previously discussed, or payback of debt RB Capital Partners Inc. held in [two of the six tickers]." (*Id.* ¶ 146.) During the alleged conspiracy, "RB Capital Partners Inc., through BRETT and DEBORAH, conducted or instructed others to conduct on behalf of RB Capital Partners Inc., the deposit, transfer, purchase, sale or withdrawal of multiple publicly traded

---

[1] Alain de Lille, *Book of Proverbs / Liber Parabolarum* (1175).

[2] Two possible qualifications are noted: it is unclear if RB Capital AS 2571 initially was funded by WF 4147. Regardless, that account opened after WF 4171, received approximately $645,000 in sales proceeds from three of the six tickers in the Indictment, and transferred nearly all those proceeds to RB Capital's WF 4176 and BofA 3757 accounts. (*See* Stewart Second Aff. ¶¶ 106–13.) The same is true for RB Capital VFM 0907, which opened after AS 2571, received approximately $4.499 million in sales proceeds from three of six tickers in the Indictment, and transferred nearly all those proceeds to BofA 3757. (*See id.* ¶¶ 126–32.)

companies . . . . [and] utilized various international and domestic brokerage accounts in the name of RB Capital Partners Inc.," totaling $115,104,260 in gross sales proceeds. (*Id.* ¶ 42.)

Six of the seized accounts are held in the name of RB Capital and contained the following amounts at seizure in 2026: BofA 3757 ($949,191.40), VFM 0907 ($59,208.09), AS 2571 ($347,913.92), BofA 3854 ($2,580.19), CPB 3924 ($27,950.53), and BofA 4774 ($1,000). (*See* McDonnell Second Suppl. Decl., ECF No. 92-1, ¶ 21.) The total amount seized from these accounts is $1,387,844.13. For seizure of these accounts under § 982(a)(1) all the Government must show is that funds in the accounts are involved in the financial transactions constituting the laundering offense. These accounts are properly restrained since the Government has made a probable cause showing that Defendants used the accounts to facilitate the laundering scheme by depositing proceeds from the securities fraud scheme into the accounts, funneling those proceeds into other RB Capital and individual accounts, and acquiring real and personal property.

2. <u>Property Acquired as Part of the Money Laundering Offense</u>

The evidence shows RB Capital's WF 4176 account was used to purchase the Rosens' house, two of their vehicles, and many of their jewelry pieces and other personal items, and that property is traceable to the property (funds) involved in the laundering scheme. Specifically, as to the residence, the Rosens made a "$6,937,409.69 wire transfer to Pickford Escrow Company on May 3, 2021 (towards the purchase of [their La Jolla, CA residence])," through the WF 4176 account. (*See* McDonnell Second Suppl. Decl. ¶ 8.) With respect to the two vehicles, the 2022 Lexus LS 500 was purchased on September 29, 2022 through WF 4176 by cashier's check withdrawal in the amount of $46,842.32 made payable to Lexus San Diego.[3] (*See* McDonnell Decl. ¶ 15.) The second vehicle (2024

---

[3] "The $46,842.32 was the remaining balance due after a vehicle trade-in credit in the amount of $52,560.00 that was applied to the total sales price ($99,402.32)" for the vehicle. (*See* McDonnell Decl. ¶ 15.) It appears the trade-in vehicle may have been purchased through a cashier's check withdrawal on

Land Rover) also was purchased via cashier's check withdrawal on RB Capital's WF 4176 account payable to Land Rover San Diego on March 6, 2023 in the amount of $84,876.13. (*See* Indictment (Count Fifteen).) These assets are therefore properly restrained as they are traceable to property involved in the laundering scheme.

Defendants also purchased approximately $531,644.75 in jewelry and watches from David and Sons, JR Jewels Inc., Rocks on Clocks LLC, and others, using funds from RB Capital's WF 4176 account during the charged conspiracy. (*See* Stewart Aff., ECF No. 87, at 22–24; McDonnell Second Suppl. Decl. ¶ 10.) The residential search warrant affidavit details eight categories of jewelry and watches purchased and traced from proceeds in RB Capital WF 4176. (*See* Stewart Aff. ¶ 48 a–h; McDonnell Second Suppl. Decl. ¶ 10.) The Government identifies with more particularity the subject jewelry pieces in its supplemental briefing. (*See* Gov't's Suppl. Br. 22–24 (identifying jewelry and watches seized as Forfeiture Nos. 7, 12–13, 18–20, 30, 36, 41, 52, 58–59).) With exception of the foregoing jewelry and watches, the Government states it will return "the items identified in the La Jolla Gem Appraisal Report dated April 1, 2026." (*Id.* at 22.)

The jewelry and watches identified in the search warrant and McDonnell's Second Supplemental Declaration are properly restrained as they, too, are traceable to property (proceeds) used in the laundering scheme.[4] All other seized jewelry and personal items will be returned to Defendants.

---

RB Capital's WF 4176 account on August 11, 2020, in the amount of $79,892.00, though that was not fully verified. (*Id.* ¶ 15 n.1 ("On August 11, 2020, WF 4176 conducted a cashier's check withdrawal in the amount of $79,892.00 made payable to Lexus San Diego. Lexus San Diego records indicate the vehicle used as a trade-in for the purchase of the 2022 Lexus was a 2020 Lexus L.S. However, Lexus San Diego did not provide purchase records for the 2020 Lexus L.S.").) Nevertheless, even if the trade-in vehicle was purchased with clean money, the entire vehicle is subject to seizure. *See United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (holding that a car partially purchased with legitimate funds was still subject to forfeiture because the "entire vehicle . . . was involved in the money laundering transaction, not merely the funds traceable to the [charged crime]").

[4] Some of the seized jewelry and personal items are subject to the transactional money laundering counts under § 1957 in Counts Four, Thirteen, and Fourteen of the Indictment. The Court declines to further address seizure under § 1957 as all seizures at issue are covered by §§ 1956(h) and 982(a)(1).

3. Commingled Accounts

Defendants contend the Government "has not established the funds it seized were the proceeds from these [alleged illicit] stock sales or the funds are otherwise 'tainted.'" (Mot. 7.) Defendants argue the accounts seized by the Government contained several million dollars *prior to* the alleged conspiracy (allegedly starting on August 10, 2020), and thus the Government cannot seize those funds. (*Id.* at 9.) Defendants also argue they had several hundred thousand dollars in untainted money from sources unrelated to the alleged fraud. (*Id.* at 9–10.) As discussed, funds in the six accounts held by RB Capital are properly seized as property involved in (facilitating) the money laundering offense.

With respect to the remaining ten accounts, nine were held by Deborah or Brett Rosen individually, and one was held by Rosen Capital LLC with Brett Rosen as the sole signatory (collectively referred to as the "individual accounts"). The Government contends that by the time the accounts were seized in 2026, the Rosens had (a) purposefully commingled the untainted funds with tainted funds through deposits and transfers between and among the RB Capital accounts and the individual accounts, thereby entirely tainting all the accounts; (b) used funds from the individual accounts—tainted and untainted—to further the securities fraud through illicit stock activity or to acquire property; and (c) exhausted any untainted funds, thus subjecting all funds in the individual accounts to seizure. Except for a few indisputably untainted disbursements to Brett and Deborah Rosen (*e.g.*, State of California check to Brett and two University of Southern California ("USC") settlement payments to Deborah), the Government contends the Rosens' "entire" lifestyle was funded by proceeds from their securities fraud scheme, (Opp'n, ECF No. 82, at 4), and that those proceeds were cycled through RB Capital accounts into the individual accounts to facilitate the money laundering scheme.

Defendants argue that "[t]he mere[] pooling [of] tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." (Defs.' Suppl. Br. 3 (citing *Tencer*, 107 F.3d at 1134).) Unlike RB Capital, which the Government has shown was effectively purposed to execute the securities fraud

and money laundering schemes, the Rosens individually had other sources of legitimate income and other facets of their lives wholly separate from the alleged securities fraud scheme. Thus, according to Defendants, even if the Rosens' individual accounts had some tainted money from RB Capital, the simple act of pooling the untainted funds with tainted funds is not sufficient to forfeit the entire account—the Government can only seize funds in those accounts if they are traced to the securities fraud (which Defendants argue the Government has not done). The problem with this argument is severalfold: it focuses on prior unlawful activity (securities fraud) and not the laundering transactions, *see Tencer*, 107 F.3d at 1134; it neglects the Government's showing through its Indictment and other evidence that Defendants agreed to commit money laundering with proceeds from the prior unlawful activity, *see Chao Fan Xu*, 706 F.3d at 980; and it is unsupported by Ninth Circuit case law regarding pooling of accounts to promote prior unlawful activity (securities fraud) or conceal that activity's assets under § 1956(a)(1)(A) & (B), *see United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994).

In *Garcia*, a former Drug Enforcement Administration agent, Darnell Garcia, was convicted of narcotics conspiracy and money laundering under § 1956, among other counts. The Government alleged the defendant had transferred $420,000 from his Swiss bank account to his account in Santa Monica and that the transferred money was proceeds from illegal narcotics transactions, which he then used to purchase a house for $581,000. *Id.* at 1363. Defendant claimed the money in the Santa Monica account came from other sources, specifically, it was the proceeds of jewelry smuggling, a crime with which he was not charged. Defendant argued the district court erred by declining to instruct the jury that the Government had to prove that the money used to purchase the house "had been specifically derived from drug trafficking," and not from some other source. *Id.* at 1364. The Ninth Circuit affirmed the district court, stating:

> We conclude that under the money laundering statutes, due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with

> other funds. . . . It is unnecessary to attempt to segregate in some manner the tainted funds from the commingled account.

*Id.* at 1365–66 ("The presence of some tainted funds in the commingled account is sufficient to taint the $420,000 wired from his Swiss account to Santa Monica to buy the house."); *see also United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996) (citing *Garcia*, 37 F.3d at 1365) (upholding § 1956 money laundering conviction and rejecting argument that all the money in the defendant's bank account must be traced to illegal activity); *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) (citing *English*, 92 F.3d at 916) (upholding § 1956 money laundering convictions and stating "in a money laundering charge, the commingling of tainted money with clean money taints the entire account. The money transferred from a commingled account does not need to be traceable to fraud, theft, or any wrongdoing at all. It is enough that the money, even if innocently obtained, was commingled in an account with money that was obtained illegally." (citation omitted)); *Tencer*, 107 F.3d at 1135 (addressing commingled accounts, and stating "[l]imiting the forfeiture of funds . . . to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the [money laundering] forfeiture statute. . . . It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." (citation omitted)). Essentially, in § 1956 money laundering cases, the *use* of a commingled account to promote unlawful activity (such as securities fraud) or conceal its proceeds *is* the crime, and § 982(a)(1) allows forfeiture of all funds in such accounts for being involved in (facilitating) the money laundering scheme.[5]

---

[5] The Government also relies on § 981(a)(1)(C), which applies generally to a variety of offenses, including securities fraud, and focuses on forfeiture of "proceeds" derived from the offense. *See* 18 U.S.C. § 981(a)(2)(A) (providing "[i]n cases involving . . . unlawful activities [here, securities fraud] . . . the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto"). Using *United States v. Omidi*, 125 F.4th 1283 (9th Cir. 2025), the Government argues that all funds in Defendants' accounts—even untainted funds—are "directly or indirectly" derived from the securities fraud and forfeit. (*See* Opp'n 9.) However, *Omidi* addressed only the Government's ability to forfeit legitimate funds generated *entirely* by

Given the expansive reach of § 1956, and forfeiture under § 982(a)(1), the Government has established that nearly all the individual accounts were used to facilitate the money laundering scheme, thus tainting those accounts. The sheer number of accounts and repetitive shuffling of funds between and among the accounts (starting with RB Capital's WF 4176 account and continuing with its BofA 3757 account) evidences an intent to money launder. Thus, the Government has made a probable cause showing that Defendants "pooled the funds to disguise the nature and source of [the money laundering] scheme." *Tencer*, 107 F.3d at 1135 (citation omitted).[6]

Here, Defendants transferred large sums of money between RB Capital accounts and from RB Capital accounts to the individual accounts. (*See, e.g.*, Stewart Second Aff. ¶¶ 135–36 (stating from September 18, 2020 to August 24, 2023 total inflows into RB Capital's WF 4176 from the sale of multiple stocks, including the six tickers referenced in

---

Omidi's health care fraud scheme and permitted the seizure because the "'very nucleus of [Omidi's] business model [was] rotten and malignant' and '[a]ny money generated through these potentially legitimate sales … resulted "directly or indirectly" from the fraudulent scheme.'" *Omidi*, 125 F.4th at 1289 (citation omitted). Here, it is undisputed Defendants Brett and Deborah Rosen received funds *unrelated* to the alleged securities fraud and deposited those funds in accounts with tainted funds. *Omidi* does not address whether seized funds unrelated to "unlawful activities" are "proceeds" under § 981, nor does it address whether placement of such funds in a commingled account is forfeit—whereas *Garcia*, 37 F.3d at 1359, *English*, 92 F.3d at 909, and *Lazarenko*, 564 F.3d at 1026, specifically address commingled accounts under § 1956 and are directly on point. In addition, § 982(a)(1) is broader than § 981(a)(1)(C) because it includes all "property" and is not limited to "proceeds." Finally, § 982(a)(1) is specific to money laundering offenses, whereas § 981(a)(1)(C) applies to a variety of offenses. The Court, therefore, focuses on forfeiture under § 982(a)(1).

[6] At the hearings in this case, the Court asked the parties to address *United States v. Kontos*, No. CR-25-00915-001-PHX-SMB, 2026 WL 1532951 (D. Ariz. June 1, 2026), a case that involved commingling of tainted and untainted funds under § 1957 (transactional money laundering). There, the district court directed the Government to relinquish the untainted funds—stating the Government "does not identify any authority persuasively establishing that when tainted money is deposited into an account with untainted money, that the untainted money becomes 'involved in' or is otherwise traceable to the underlying money laundering." *Id.* at *4. Because the district court in *Kontos* was not evaluating forfeiture in the context of § 1956 (let alone *conspiracy* to violate §§ 1956 and 1957), it did not consider *Garcia*, 37 F.3d at 1359, *English*, 92 F.3d at 909, or *Lazarenko*, 564 F.3d at 1026, which squarely apply to this case, and distinguish *Kontos*.

the Indictment, were $119,781,443 and proceeds from those sales were "[s]ourced . . . to other RB Capital Partners Inc. bank accounts, other company bank accounts controlled by Brett Rosen or Deborah Rosen, and bank accounts in the name of Deborah Rosen").) Deborah Rosen also transferred large sums of money between her individual accounts, and from her individual accounts to RB Capital accounts. (*See id.* at 50–54.) A sample web of transactions follows.

During the charged conspiracy Defendants transferred proceeds between RB Capital accounts: *e.g.*, WF 4176 to BofA 3757 ($2.068 million), BofA 3757 to BofA 3854 ($1 million), AS 2571 to WF 4176/BofA 3757 (approximately $638,000), VFM 0907 to BofA 3757 ($4.8 million), and WT 7402[7] to WF 4176/BofA 3757 ($7.42 million). (*See id.* at 37–42.) RB Capital transferred proceeds to other bank accounts not in the name of RB Capital but controlled by Brett and Deborah Rosen: *e.g.*, WF 4176 to Seapoint Capital Partners Inc.'s WF 1030[8] ($3.67 million), and BofA 3757 to Rosen Capital LLC's CPB 1205[9] ($130,000). (*Id.* ¶¶ 137, 152.) RB Capital transferred proceeds to a bank account in the name of Brett Rosen: *e.g.*, WF 4176/BofA 3757 to BR PPB 1207[10] ($198,000). (*Id.* ¶ 172.) RB Capital transferred proceeds to bank accounts in the name of Deborah Rosen: *e.g.*, WF 4176 to DR JPM 2674 ($1,467,224), WF 4176 to DR ETrade 6141 ($1 million), WF 4176 to DR JPM 0803 ($1 million), and BofA 3757 to DR JPM 2674 ($350,000). (*See id.* at 44–47.) Finally, Deborah Rosen transferred funds between her accounts and to RB

---

[7] RB Capital WT 7402 is not one of the 16 accounts at issue but transacted with other RB Capital accounts during the alleged conspiracy.

[8] WF 1030 is held in the name of Seapoint Capital Partners Inc., with Brett and Deborah Rosen as signatories. It is not one of the 16 accounts at issue but transacted with other involved accounts during the alleged conspiracy.

[9] CPB 1205 is held in the name of Rosen Capital LLC, with Brett and Deborah Rosen as signatories.

[10] For reference clarity, Brett Rosen's accounts are assigned "BR" before the identified account, and Deborah Rosen's accounts are assigned "DR."

Capital accounts: *e.g.*, DR JPM 4426 to DR JPM 5853 ($2.66 million), DR JPM 2674 to DR JPM 5853 ($550,000), DR JPM 5852 to DR JPM 5853 ($765,000), DR JPM 4426 to DR JPM 5852 ($1 million), DR JPM 0803 to DR ETrade 6141 ($1 million), DR ETrade 6141 to DR JPM 2674 ($4 million), DR JPM 2674 to DR JPM 4426 ($3.28 million), and DR JPM 2674 to RB Capital BofA 3757 ($1.5 million).[11] (*See id.* at 46–54.)

The Government has made a probable cause showing that all but one of the Rosens' individual accounts are involved in (facilitated) the money laundering scheme through the labyrinth of money transfers during the charged conspiracy. Accordingly, with exception of BR/DR CPB 8215,[12] all untainted funds pooled in the seized accounts are forfeitable. *See Lazarenko*, 564 F.3d at 1035 (stating in a "money laundering charge, the commingling of tainted money with clean money taints the entire account"); *Tencer*, 107 F.3d at 1135 (stating it "is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue").

Here, Deborah Rosen received two settlement checks from USC which are unrelated to the alleged securities fraud. However, both checks were pooled with tainted proceeds in two accounts that were actively used in the money laundering offense: one check for $278,227.19 was deposited in DR JPM 0803 on November 15, 2021, and the second check for $326,728.68 was deposited in DR JPM 2674 on September 21, 2022. (*See* McDonnell Suppl. Decl. 3–5 (tracking transfer of millions of dollars from those two accounts during

---

[11] Deborah Rosen purchased real property in Miami, Florida on April 23, 2021, for approximately $2.9 million with RB Capital WF 4176 proceeds that were "primarily sourced from stock sale proceeds in the 6 previously discussed tickers." (*See* Stewart Second Aff. ¶ 147.) After selling that property, Ms. Rosen deposited approximately $1.63 million into RB Capital's BofA 3757 account. (*Id.*)

[12] BR/DR CPB 8215 is held in the name of Brett and Deborah Rosen, with Brett and Deborah Rosen as signatories.

the charged conspiracy to numerous other seized accounts).) For reasons set forth above, these funds have become tainted and are properly restrained.[13]

However, the same is not true for BR/DR CPB 8215, which was opened on June 17, 2024, and held in the name of Brett Rosen and Deborah Rosen, with Brett and Deborah Rosen as signatories. (*See* Stewart Second Aff. ¶ 162.) On August 12, 2024, BR/DR CPB 8215 received an account opening transfer of $1,000 from RB Capital's CPB 3924 account. (McDonnell Suppl. Decl. ¶ 74.) The only other deposit was a check deposit in the amount of $24,139 from the State of California. (*Id.*) The account had total outflows of approximately $4,060 and had an ending balance as of September 30, 2025 of $21,079.08. (*Id.* ¶ 73.) In *Tencer*, the court stated forfeiture of legitimate and illegitimate funds commingled in an account is "proper as long as the government demonstrate[s] that the defendant had pooled the funds to disguise the nature and source of his scheme." 107 F.3d at 1135 (citation omitted). Here, the Court is not persuaded the Government has made a probable cause showing that Brett Rosen pooled the funds he received from the State of California with the $1,000 opening deposit from RB Capital to facilitate the money laundering scheme. *See id.* (citing *Marine Midland Bank v. United States*, Nos. 93 Civ. 0307, 93 Civ. 0357, 1993 WL 158542, at *7–8 (S.D.N.Y. May 11, 1993) (noting cases that decline to apply "facilitation theory where legitimate funds in account had merely an 'incidental or fortuitous' connection to illegal activity"), *aff'd in part, remanded in part*, 11 F.3d 1119 (2d Cir. 1993)). Accordingly, the funds remaining in BR/DR CPB 8215 ($17,479.08) will be returned to Defendants.

At time of seizure, the accounts determined to be properly restrained held the following amounts: DR ETrade 6141 ($11,804.07), DR ETrade 6208 ($798,428.35), DR

---

[13] Despite the commingling of settlement payments, the Government is willing as a matter of equity—without conceding forfeitability or its right to seek these funds to satisfy any later forfeiture order should there be a conviction at trial—to return the second settlement check to Ms. Rosen: $326,728.68. (Gov't's Suppl. Br. 22.) The Court encourages the Government to return that portion of the settlement payment to Ms. Rosen, though it is not legally required to do so.

JPM 2674 ($134,236.84), DR JPM 0803 ($145,364.53), DR JPM 5852 ($1.11), DR JPM 5853 ($3,846,630.78), DR JPM 4426 ($30,651.00), BR PPB 1207 ($22,161.96), and Rosen Capital LLC CPB 1205 ($44,906.57). (*See* McDonnell Suppl. Decl. 20.) The total seizure of these accounts is $5,034,185.21.

4. Electronic Devices

The Government contends most of the seized electronic devices have been imaged, but segregation pursuant to the search warrant has not been completed. According to the Government, segregation involves multiple layers of review because of the need to retain a filter team to first filter out potentially privileged information. (*See* Opp'n 12.) Under the circumstances, retention of these devices is reasonable pending completion of the segregation review. *See Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993) ("Rule 41(e) provide[s] that 'reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property.' The United States' retention of the property generally is reasonable if it has a need for the property in an investigation or prosecution."). The Court therefore defers ruling on the Government's continued possession of these devices pending completion of its segregation review.

## III. CONCLUSION

While a qualified right to counsel of choice in criminal proceedings exists under the Sixth Amendment, *Powell v. Alabama*, 287 U.S. 45, 53 (1932), there is a "strong governmental interest in obtaining full recovery of all forfeitable assets . . . that overrides any Sixth Amendment interest" in permitting a defendant's "use [of] assets adjudged forfeitable to pay for their defense," *Caplin & Drysdale v. United States*, 491 U.S. 617, 631 (1989). So it is here. Accordingly, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion is granted as to all remaining funds in account BR/DR CPB 8215 as well as the jewelry and other personal items identified in the La Jolla Gem Appraisal Report. Such funds and personal items will be returned to Defendants within **fourteen (14) days** of entry of this Order. The motion is denied in all other respects.

/ / /

**IT IS SO ORDERED.**

Dated: August 3, 2026

Hon. Dana M. Sabraw
United States District Judge